**LIBERTY MUTUAL INSURANCE COMPANY, Appellant–Plaintiff,**

v.

**MICHIGAN MUTUAL INSURANCE COMPANY, Appellee–Defendant.**

No. 49A02–0708–CV–723.

Court of Appeals of Indiana.

July 29, 2008.

Mark D. Gerth, Kightlinger & Gray, LLP, Indianapolis, IN, Attorney for Appellant.

Stephen J. Peters, David I. Rubin, Harrison & Moberly, LLP Indianapolis, IN, Attorneys for Appellee.

**OPINION**

FRIEDLANDER, Judge.

Liberty Mutual Insurance Company (Liberty Mutual), as subrogee of Duke Realty Corporation d/b/a Duke–Weeks Realty Services (Duke), appeals the grant of summary judgment in favor of Michigan Mutual Insurance Company (Michigan Mutual) in a declaratory judgment action regarding Michigan Mutual's duty to defend and indemnify Duke under a commercial general liability policy issued by Michigan Mutual to Trilithic, Inc. (Trilithic), a tenant of Duke. Liberty Mutual contends that summary judgment should have been granted in its favor because the liability in question arose out of Trilithic's use of the leased premises and Duke was, therefore, covered under the policy as an additional insured.

We affirm.

On the morning of January 11, 2001, Linda Swann, an employee of Trilithic, was on her way to work when she slipped and fell on a snow- and ice-covered pathway leading from the employee parking lot to a door located at the back of the Trilithic facility. She was entering the building through the back door because that was the entrance Trilithic required its assembly line employees to use. The Trilithic facility was located in a portion of one of the buildings in the Hunter Creek Business Park and was leased by Trilithic from Duke. It was Duke's responsibility under its lease with Trilithic to maintain common areas such as this pathway. Thus, it is undisputed that Swann fell and sustained her injuries outside the leased premises and in an area under the control and responsibility of Duke.

Under the lease, Trilithic was required to obtain insurance and pay the premiums to insure Duke and Trilithic against public liability and property damage. Accordingly, Trilithic obtained a commercial general liability policy from Michigan Mutual. While Trilithic was the named insured under the policy, for no additional premium an endorsement was attached to the policy designating Duke as an additional insured. The endorsement provided in pertinent part:

> WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule. . . .

*Appellant's Appendix*, Vol. 2 at 84.

After Swann and her husband filed a personal injury action against Duke in February 2002, Duke tendered the defense of the action to Michigan Mutual pursuant to the additional insured endorsement. Michigan Mutual declined to defend or indemnify Duke against the Swanns' claims. As a result, Duke's general liabili-

ty insurer, Liberty Mutual, defended and indemnified Duke, ultimately settling the Swanns' claims in June 2006 for an immediate cash payment and future periodic payments.

In the meantime, on June 2, 2005, Duke filed a complaint for declaratory judgment with the trial court in which it sought a declaration that the insurance policy issued by Michigan Mutual provided coverage to Duke for the injury claims asserted by the Swanns. Along with its answer, Michigan Mutual filed a counterclaim for declaratory judgment, claiming the policy did not provide coverage to Duke for the Swanns' claims. The parties subsequently filed cross-motions for summary judgment, and Michigan Mutual requested that Liberty Mutual be substituted for Duke as the real party in interest. On March 2, 2007, the trial court conducted a hearing on the motions for summary judgment. At the hearing, Duke's counsel acknowledged that Liberty Mutual, as subrogee of Duke, was the real party in interest. Accordingly, the trial court substituted Liberty Mutual in place of Duke as the plaintiff in the declaratory judgment action. The court also, on June 25, 2007, denied Liberty Mutual's motion for summary judgment and granted Michigan Mutual's cross-motion for summary judgment.[1] In sum, the trial court declared that Michigan Mutual had no obligation to defend or indemnify Duke against the Swanns' claims. Liberty Mutual now appeals the trial court's summary judgment rulings.

The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bushong v. Williamson,* 790 N.E.2d 467 (Ind.2003).

On appeal, our standard of review is the same as that of the trial court. Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Olds v. Noel,* 857 N.E.2d 1041 (Ind.Ct.App. 2006). Further, the fact the parties made cross-motions for summary judgment does not alter our standard of review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Hartford Accident & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285 (Ind.Ct.App.1997), *trans. denied.*

■■■ Resolution of this case hinges on the interpretation of the additional insured endorsement attached to the insurance policy issued by Michigan Mutual. The interpretation of an insurance policy is generally a question of law appropriate for summary judgment. *Smith v. Auto–Owners Ins. Co.,* 877 N.E.2d 1220 (Ind.Ct.App. 2007), *trans. denied.* We review an insurance policy using the same rules of interpretation applied to other contracts, namely if the language is clear and unambiguous we will apply the plain and ordinary meaning. *Id.* An insurance policy is ambiguous where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *American Family Ins. Co. v. Globe Am. Cas. Co.,* 774 N.E.2d 932 (Ind. Ct.App.2002), *trans. denied.* An ambiguity, however, does not exist merely because the parties favor different interpretations. *Id.* "Additionally, the power to interpret contracts does not extend to changing their terms, and we will not give insur-

---

1. The trial court entered extensive findings and conclusions in the instant case. While we are not bound by such findings and conclusions, they certainly facilitate our review by providing us with a statement of the reasons for the trial court's actions. *See Rice v. Strunk,* 670 N.E.2d 1280 (Ind.1996).

ance policies an unreasonable construction to provide added coverage." *Id.* at 935.

The parties appear to agree that the policy language at issue is ambiguous. They dispute, however, whether we should construe the policy against the insurer or from a neutral stance. Liberty Mutual directs us to the general rule that an insurance policy should be construed against the insurer. *See State Farm Mut. Auto. Ins. Co. v. D'Angelo,* 875 N.E.2d 789 (Ind. Ct.App.2007), *trans. denied.* Michigan Mutual, however, advances the position taken by the trial court that this is a dispute between insurance companies and because neither Liberty Mutual nor Duke paid any premiums for the Michigan Mutual Policy, it must be construed from a neutral stance.

In *Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.,* 260 Ind. 32, 291 N.E.2d 897 (1973), our Supreme Court stated:

> [W]e are in fact in this instance not dealing with the two parties to the contract. The party claiming to be an insured in this case never paid a penny's premium to the insurer. We are therefore not in a situation where we must construe the contract language any certain way and can seek out the general intent of the contract from a neutral stance.

*Id.* at 899 (interpreting the phrase "arising out of the ownership, maintenance or use" of a truck as applied to *unnamed insureds); see also American Family Ins. Co. v. Globe Am. Cas. Co.,* 774 N.E.2d at 936 ("when a case involves a dispute between a third party and an insurer, ... we determine the general intent of the contract from a neutral stance"); *Harden v. Monroe Guar. Ins. Co.,* 626 N.E.2d 814, 817 n. 2 (Ind.Ct.App.1993) ("[w]hen an unnamed insured seeks coverage under an insurance policy, courts may determine the

general intent of the contract from a neutral stance"), *trans. denied; Town & Country Mut. Ins. Co. v. Sharp,* 538 N.E.2d 6, 10 n. 3 (Ind.Ct.App.1989) ("[a]s judgment creditors the Sharps are not entitled to the benefit of a liberal construction of an insurance policy which was issued to and for the benefit of another party"), *trans. denied.*

Liberty Mutual recognizes these cases but argues they are distinguishable. Specifically, Liberty Mutual notes that its subrogee, Duke, was not a stranger to the contract but, rather, was specifically named as an additional insured in an endorsement attached to the policy. Liberty Mutual's argument has merit, as Duke was an additional named insured (under limited circumstances, of course) and the policy was procured for its benefit, as well as Trilithic's. *See Rollins Burdick Hunter of Utah, Inc. v. Board of Trs. of Ball State Univ.,* 665 N.E.2d 914, 923 (Ind.Ct.App. 1996) (in different context, stating that party named as additional insured on an insurance contract was "a named insured"). We need not expressly decide the issue, however, because we would reach the same conclusion in this case regardless of whether the additional insured endorsement is construed in favor of the additional insured or from a neutral stance.

▇▇▇ We now turn to the main issue, whether Michigan Mutual owed Duke a duty to defend and indemnify under the circumstances of this case. Although a liability insurer's duty to defend its insured against suit is broader than its duty to indemnify, this principle only applies when the risk is insured against. *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37 (Ind.2002). "Where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim is patently outside of the risk cov-

ered by the policy, the insurer may properly refuse to defend." *Id.* at 42 n. 6.

As set forth above, the additional insured endorsement provides coverage to Duke for "liability arising out of the ownership, maintenance or use of that part of the premises leased to [Trilithic]". *Appellant's Appendix,* Vol. 2 at 84. Although the language of the additional insured endorsement is boilerplate, there appears to be no reported cases in Indiana interpreting the provision's meaning.[2]

Liberty Mutual argues that although the fall occurred outside the leased premises and as a result of Duke's negligence, liability for Swann's fall arose out of the use of that part of the premises leased to Trilithic because Swan was injured "as she was reporting to work on the leased premises while using the only route to the only door into the premises which she was permitted to use by Trilithic." *Appellant's Reply Brief* at 2. Liberty Mutual favors an expansive interpretation of the phrase "arising out of" such as "broadly link[ing] a factual situation with the event creating liability, and connot[ing] only a minimal causal connection or incidental relationship." *Acceptance Ins. Co. v. Syufy Enters.,* 69 Cal.App.4th 321, 81 Cal.Rptr.2d 557, 561 (1999).

In support of its position, Liberty Mutual directs us to *Maryland Cas. Co. v. Chicago & N.W. Transp. Co.,* 126 Ill. App.3d 150, 81 Ill.Dec. 289, 466 N.E.2d 1091 (1984), in which the Illinois Court of Appeals held that the lessee's general liability insurance covered the additional insured lessor against claims asserted by the lessee's employee when she was raped in the lessor's passenger terminal as she reported to work at a news stand leased to her employer. In affirming summary judgment in favor of the lessor, the court stated in part:

> None of the cases cited thus involved a situation closely paralleling that presented here: injuries caused by the alleged negligence of an additional insured under a liability policy and sustained by the employee of the named insured, immediately outside the leased premises as she was about to begin her daily employment. Nevertheless, by construing the policy liberally in favor of the insured—a procedure necessitated by the ambiguity of the "arising out of" language—the instant injuries appear to have arisen from the operation and use of the leased premises, since they would not have been sustained "but for" the victim's employment on those premises. She was about to commence her employer's operation when she was assaulted. She,

---

2. In a different context, Indiana courts have defined the phrase "arising out of" (a phrase used in the additional-insured endorsement here) to mean the efficient and predominating cause. *See e.g., Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.,* 291 N.E.2d at 899 (holding in the automobile liability context that "what was intended by the words in the contract, 'arising out of the ownership, maintenance or use' of the truck as applied to unnamed insureds is synonymous to being caused by use of the truck"; in other words, "the 'efficient and predominating cause' of the accident must arise out of the use of the vehicle in order for an unnamed insured to be covered"); *Meridian Mut. Ins. Co. v. Purkey,*

769 N.E.2d 1179 (Ind.Ct.App.2002) (applying efficient and predominating cause test to arising out of language in automobile exclusion of commercial general liability policy). Though instructive, we find that the efficient and predominating cause test is not directly applicable to the context at hand. This is in contrast to the automobile liability and automobile exclusion cases, where the concept of an injury being caused by the use of a vehicle is not only easy to apply but is necessary to distinguish automobile liability insurance from general liability insurance. *Cf. Meridian Mut. Ins. Co. v. Purkey,* 769 N.E.2d 1179 (recognizing that there are different insurance policies on the market for different purposes).

in fact, was holding keys to open the office. Her presence in the terminal at that hour was not a fortuitous happenstance, but a regular and foreseeable occurrence. The policy, therefore, reasonably must be construed to cover any risks attendant upon her presence there resulting from C & NW's negligence and thereby activates Maryland's duty to defend C & NW.

*Id.* at 1094–95.[3]

Several cases from other jurisdictions, however, have rejected such a broad interpretation of additional insured endorsements such as the one in the instant case. *See, e.g., Hilton Hotels Corp. v. Employers Ins. of Wausau,* 629 So.2d 1064, 1065 (Fla. Dist.Ct.App.1994) ("isolated connection insufficient to bring this accident within coverage of the policy" where lessee's employee's fall did not occur on leased premises, but rather in lessor's lobby, and "[t]he only way that this accident was even remotely related to the gift shop, was due to the pure coincidence that the injured party was a [gift shop] employee on her way to work"); *Northbrook Ins. Co. v. American States Ins. Co.,* 495 N.W.2d 450 (Minn.Ct. App.1993) (no coverage for landlord under tenant's general liability insurance policy with similar additional insured provision where tenant's employee fell on ice in alley behind leased premises, an area under the control of landlord); *United States Fid. & Guar. v. Drazic,* 877 S.W.2d 140 (Mo.Ct. App.1994) (no coverage where employee of tenant fell in parking lot of landlord's commercial building). We agree with these cases that more than an incidental connection with the leased premises is required to obtain coverage under an additional insured endorsement.

■ One of the primary functions of an additional insured endorsement in the landlord-tenant context is to protect the landlord from vicarious liability for acts of its tenant on the leased premises. *Northbrook Ins. Co. v. American States Ins. Co.,* 495 N.W.2d 450. "The additional insured endorsements in these settings are meant to provide specialized protection rather than all-encompassing coverage." *United States Fid. & Guar. v. Drazic,* 877 S.W.2d at 143.

We find the case of *Northbrook Ins. Co. v. American States Ins. Co.* particularly instructive. In that case, while loading a truck, an employee of the lessee bakery slipped and fell on ice in the alley behind the shopping center in which the bakery was located. The employee subsequently sued the landlord, Fine Properties, alleging failure to maintain the alleyway. Like in the instant case, the landlord was an additional insured on the lessee's general liability insurance policy with respect to liability arising out of the ownership, maintenance, or use of the leased premises. Concluding that the policy did not provide coverage for the landlord, the court explained:

The question whether coverage is afforded for a particular claim depends on whether liability arises out of a hazard associated with the named insured's

---

**3.** The Illinois court expressed concern for limiting the geographic scope of liability and distinguished other cases as follows:

The instant leased premises, however, include three separate news-stand sites as well as separate office and storage areas, all within the confines of the "designated premises," the passenger terminal. It is foreseeable, therefore, that employees of

[lessee] would necessarily and customarily use the nonleased portions of the terminal in order to go about their employer's business. Extending coverage here to areas of the terminal nearby [the] leased premises in the terminal would not create potentially unlimited geographic liability.

*Id.* 466 N.E.2d at 1094.

business. Fine Properties is entitled to coverage only if the claimed liability is based on a hazard associated with the bakery's business.

The American States policy described the premises insured as the 3,200 square feet the bakery occupied in the Texa–Tonka Shopping Center. The premium charged was based on insuring the bakery, not the common areas of the shopping center. The additional insured endorsement under which Fine Properties was added as an insured specified it provided coverage, only with respect to liability arising out of the ownership, maintenance or use of the insured premises, i.e., the bakery. By its terms, the endorsement provides coverage for Fine Properties's negligence in the bakery. Coverage is not provided for the rest of the Texa–Tonka Shopping Center.

The lease agreement between Fine Properties and the bakery required Fine Properties to maintain the alley. Failure to maintain the alley is a claim unrelated to the business of the bakery, and the American States policy therefore does not cover such a claim against Fine Properties.

*Northbrook Ins. Co. v. American States Ins. Co.*, 495 N.W.2d at 453 (footnote omitted) (emphasis in original). We agree with this reasoning.

Like in *Northbrook Ins. Co. v. American States Ins. Co.*, the accident here did not occur on the part of the premises leased to Trilithic. Rather, it occurred in a common area outside of the leased premises and under Duke's control. Further, there was no physical connection between the accident and the leased premises or Trilithic's business operations thereon. *See Hilton Hotels Corp. v. Employers Ins. of Wausau*, 629 So.2d at 1065 ("accident was not a result of any physical condition which emanated from the premises, such as flowing liquid, an escaped animal, or a runaway vehicle"). There is no allegation that the ice and snow on which Swann slipped originated on the leased premises, was caused by the leased premises, was connected to work done on the leased premises, or had any other significant connection with the leased premises. Rather, the accident in question clearly arose out of Duke's own failure to maintain the pathway from the parking lot to the employee entrance. The only way Swann's fall was even remotely related to the leased premises was due to the fact Swann was on her way to work.[4] We deem this "isolated connection" insufficient to bring the accident within the coverage of the policy under the additional insured endorsement. *Id.* Therefore, Michigan Mutual had no duty to defend or indemnify Duke, and the trial court properly granted summary judgment in favor of Michigan Mutual.

Judgment affirmed.

ROBB, J., and MATHIAS, J., concur.

---

4. Allowing such a slight connection to bring the accident within coverage of the policy would unreasonably broaden the geographic scope of liability. To be sure, the Hunter Creek Business Park is expansive, with extensive common areas and fourteen buildings totaling over 1.5 million square feet. Trilithic leased only an interior portion of one building (the center building) in the business park. Under Liberty Mutual's reasoning, the additional insured endorsement would potentially provide coverage to Duke for an accident occurring at the entrance of the business park. This is not reasonably within the landscape of risk contemplated by the additional insured endorsement.